IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TRACY MONEGAIN,

       **Plaintiff,**

v.                                              **Civil Action No. 3:19cv721**

COMMONWEALTH OF VIRGINIA
DEPARTMENT OF MOTOR VEHICLES, *et al.*,

       **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendants Michael Baxter, Rena Hussey, and Jeannie Thorpe's (collectively, the "Individual Defendants") Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  (ECF No. 19.)  Plaintiff Tracy Monegain responded, (ECF No. 23), and the Individual Defendants replied, (ECF No. 24).  This matter is ripe for disposition.  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[2]  For the reasons that follow, the Court will grant in part and deny in part the Individual Defendants' Motion to Dismiss.

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Defendant Commonwealth of Virginia Department of Motor Vehicles did not move to dismiss the three claims raised against it.

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Monegain brings claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the Constitution of the United States, meaning her action arises under the laws of the United States.

## I. Factual and Procedural Background

Monegain, a former Virginia Department of Motor Vehicles ("DMV") employee, brings this five-count Complaint in which she alleges that she suffered discrimination, harassment, retaliation, and constitutional violations due to her transition to a female gender identity and gender expression during her employment with the DMV.  The Complaint brings claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"),[3] 42 U.S.C. §1983,[4] and the First[5] and Fourteenth[6] Amendments of the Constitution of the United States of America.  Monegain brings Counts I through III against Defendant DMV—which has

---

[3] Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

[4] Title 42, Section 1983 of the United States Code states that:

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress , . . . injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

[5] The First Amendment states, in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. CONST. amend. I. The Fourteenth Amendment extended this prohibition to the states. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

[6] The Fourteenth Amendment provides, in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ." U.S. CONST. amend. XIV.

2

not moved to dismiss the claims against it—and Counts IV through V against Defendants Baxter, Hussey, and Thorpe.

## A. Factual Allegations[7]

Monegain "is a female citizen of the United States" who "has a female gender identity[,] . . . a feminine gender expression[,] . . . [and] is transgender."[8]  (Compl. ¶¶ 16–19, ECF No. 1.) Monegain worked at the DMV as a "Technical Services Supervisor from October 1993 [until] her unlawful and involuntary resignation [twenty-five years later] on or about January 5, 2018." (*Id.* ¶¶ 3, 4.)  The DMV is "an organized and existing department of the government of the State of Virginia and is an employer as that term is defined by Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h)."  (*Id.* ¶ 5.)  At all relevant times, the DMV "employed more than 500 employees," (*id.*), including Baxter, Hussey, and Thorpe.  (*Id.* ¶ 6).  Hussey and Baxter were "at all relevant times . . . General Administrative Manager[s] of the [DMV]."  (*Id.*) "Thorpe was, at all relevant times, a Human Resource Manager of the [DMV]."  (*Id.*)  The Individual Defendants are sued in their individual capacities.  (*Id.*)

### 1.    Monegain Begins to Experience Harassment at Work

In March 2016, thirteen years after beginning employment at the DMV, Monegain informed her supervisor, Michael Baxter, "that she was transgender."  (*Id.* ¶ 34.)  Monegain

---

[7] For the purpose of the Rule 12(b)(6) Motion to Dismiss, the Court will accept the well-pleaded factual allegations in Monegain's Complaint as true and draw all reasonable inferences in favor of Monegain.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("[A] court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[8] Monegain states that "[g]ender refers to cultural expectations specific to the sexes" and that "[g]ender expression refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth."  (Compl. ¶¶ 22–23.)

3

"asked Baxter to keep this information private." (*Id.* ¶¶ 34–35.)  Following this initial conversation, Baxter "repeatedly asked [Monegain] about whether she intended to come out to her employees and the rest of the department; whether she wanted surgeries, and what gender dysphoria is and how it affected a person."[9]  (*Id.* ¶ 36.)  Monegain "advised Baxter that she was unsure what her plans were and that it was not time for her to come out at work." (*Id.*)

On March 29, 2016, Monegain learned of a conversation involving three of her subordinates, including Scott Vaughan, in which she "was called 'gay' and 'faggot' because she was living with a man." (*Id.* ¶¶ 38, 39.)  Monegain confronted the participants, "who confirmed that the conversation had occurred," and informed them "that the conversation was inappropriate . . . should not have occurred . . . . [and] instructed them to refrain from such conversations going forward." (*Id.* ¶¶ 40–42.)  Monegain reported the conversation to Baxter who told Monegain "that it was just 'boys being boys.'" (*Id.* ¶¶ 43–44.)  Neither Baxter nor the DMV took action to address the conversation.  (*Id.* ¶ 45.)

On April 4, 2016, Monegain finalized her name change "and her legal name became Tracy Monegain." (*Id.* ¶ 46.)  On April 22, 2016, Baxter offered Monegain a transfer to a different department, which "would constitute a demotion in that it would remove all her direct reports." (*Id.* ¶ 47.)  Baxter told Monegain that he thought the position would reduce Monegain's "'day to day stress from the work group,' a reference to the harassment she was receiving at work from her direct reports and others based on her gender and gender expression." (*Id.* ¶ 48.)  Monegain avers that the "intent and effect of the transfer was to remove [her] from

---

[9] Monegain explains that gender dysphoria "is the formal diagnosis used by physicians and psychologists to describe people who experience significant distress with the sex they were assigned at birth" and that "gender dysphoria has been identified as resulting from a physiological condition of the brain and neurological system." (Compl. ¶¶ 25, 27.)

public view because of her gender and gender expression, and an attempt to hide her from public view in order to avoid the need for the DMV to take prompt and effective action to stop the harassment." (*Id.* ¶ 49.) Monegain states that although Baxter "assured" Monegain he had no "concerns about her work performance or work ethic," Baxter's "demeanor, despite his words, conveyed that . . . Baxter was upset with Ms. Monegain because of her gender and gender expression, so that she was not reassured by . . . Baxter." (*Id.* ¶¶ 50–52.) Monegain declined the transfer. (*Id.* ¶ 54.)

On May 23, 2016, Monegain "filed an EEOC charge alleging that the DMV was violating the Americans With Disabilities Act by refusing to cover her transgender care within her health insurance coverage." (*Id.* ¶ 55.) Monegain obtained a new drivers' license and social security card with her changed name, and informed Baxter that "that it was no longer appropriate to sign documents with her prior name . . . . [as] she was concerned about a litigation risk to herself and to the Department." (*Id.* ¶¶ 58–59.) Monegain asserts that Baxter "told her to keep signing the documents with her prior name." (*Id.* ¶ 60.)

### 2. Monegain Communicates That She Planned to Begin Presenting as Female at Work

Monegain "determined that it was time for her to begin presenting as female at work" and "advised Baxter that she planned to begin presenting as female at work on August 1, 2016." (*Id.* ¶¶ 61–62.) Monegain states that "presenting as female at work" meant that "she would be wearing clothing, makeup, body styling and hair styling typically associated with a feminine gender expression." (*Id.* ¶ 63.) Monegain asserts that although "Baxter stated that he would support her transition, his body language indicated to Ms. Monegain in a very obvious manner that he was very uncomfortable with the prospect." (*Id.* ¶ 64.) Baxter instructed Monegain "to begin informing her work group and other colleagues that she interacted with" and stated that he

5

"would inform Human Resources ("HR") and upper management about her intent to transition." (*Id.* ¶ 65.)

On July 8, 2016, Baxter informed Monegain that during a meeting, Thorpe had stated "that '[i]f we let 'it' do this, then they will all come out." (*Id.* ¶¶ 68–69.) Monegain "was shocked and upset by Thorpe's statement and her antipathy toward Ms. Monegain." (*Id.* ¶ 70.) Monegain "spoke with her subordinates about her transition" who all "assured her that they were supportive except for Scott Vaughan, who told Ms. Monegain that he would not support any of it and that he no longer wanted anything to do with her if she transitioned." (*Id.* ¶ 71.) "Neither Baxter nor [the] DMV took any action regarding Vaughan or his comments." (*Id.* ¶ 72.)

### 3. <u>Monegain Begins Presenting as Female at Work</u>

On July 29, 2016, Monegain "came into work presenting as a woman for the first time" and wore "clothing, makeup, body styling and hair styling typically associated with a feminine gender expression." (*Id.* ¶¶ 73–74.) One co-worker made unwelcome sexual comments to Monegain about "'pimping girls'" and her appearance, but when Monegain reported those comments to Baxter he "laughed" and "neither Baxter nor [the] DMV took action to address the comments or environment." (*Id.* ¶¶ 75–79.) Another coworker "confronted Baxter about allowing Ms. Monegain to dress as a female at work and had asked Baxter to take action against Ms. Monegain." (*Id.* ¶ 81.) Baxter told the complaining coworker "to get over it but took no further action." (*Id.*) Despite several instances of harassment, Monegain reports that "Baxter and [the] DMV took no action to investigate or address Ms. Monegain's complaints." (*Id.* ¶ 90.) "On information and belief," Monegain avers that Baxter "reported the harassment to Defendant Rena Hussey . . . . [and] Defendant Jeannie Thorpe." (*Id.* ¶¶ 92–93.)

6

On August 21, 2016, Baxter informed Monegain of "a new dress code that was written specifically for her by Baxter," (the "Dress Code Policy"). (*Id.* ¶ 96.) Monegain asserts that "[n]o other employee was subject to this dress code." (*Id.* ¶ 97.) "Per this dress code, Ms. Monegain was not allowed to wear dresses, skirts, heels, jeans with any decoration, or, oddly, collars, but was required to always wear a bra and was required to wear a uniform to all Motor Carrier meetings." (*Id.* ¶ 98.) Although Monegain "expressed to Baxter that she found this to be discriminatory," she "complied . . . because she wanted to keep her job." (*Id.* ¶¶ 99–100.)

On November 9, 2016, Monegain and Baxter "discussed Monegain's request for leave in order to have gender-related surgery." (*Id.* ¶ 103.) Monegain avers that "Baxter was reluctant to allow her time off but relented after Ms. Monegain explained to him the nature of gender dysphoria and the necessity of this surgery." (*Id.* ¶ 104.) "Ms. Monegain was off work for most of December 2016 for the surgery." (*Id.* ¶ 105.) On January 10, 2017, Monegain and Baxter discussed additional gender-related surgery, with Baxter allegedly showing Monegain "an animated video of the surgery" and stating, "'That's going to hurt!'" and "'Be careful what you wish for!'" (*Id.* ¶¶ 106–07.)

Monegain "was off work from February 22, 2017 through April 17, 2017 for gender reassignment surgery and recovery." (*Id.* ¶ 109.) After returning to work, Monegain asserts that she "continued to be subjected to sexual harassment and a hostile working environment," which she reported to Baxter. (*See id.* ¶¶ 110–12.) "On information and belief, Baxter reported the harassment to John Gozola, an employee in the DMV's HR department" but the "DMV's HR department took no action to investigate or address the harassment of Ms. Monegain." (*Id.* ¶¶ 112–13.) According to Monegain, this harassment became so severe that "Baxter also began to misgender Ms. Monegain and refer to her by her previous male name in public, though he did

not do so in private." (*Id.* ¶ 115.) "Upon information and belief, the environment had become so toxic that Baxter felt it necessary to misgender Ms. Monegain and refer to her by her previous male name in public at work in order to avoid harassment himself."[10] (*Id.* ¶ 116.) Monegain generally alleges that "Baxter and Defendant DMV took no action to investigate or stop the harassment." (*Id.* ¶ 117.)

### 3.   DMV Subjects Monegain to an Audit and Forces Her to Resign

In April 2017, after Monegain returned to work from her gender reassignment surgery, the DMV subjected Monegain "to an audit for the first time in her twenty-four (24) years of employment with the DMV." (*Id.* ¶ 120.) DMV initiated the audit based on four anonymous complaints about Monegain in late 2016, all received after she began presenting as female at work. (*Id.* ¶¶ 120–22.) The complaints, which included over thirty (sometimes duplicative) allegations, came into the DMV while Monegain was on leave. (*Id.* ¶ 125.) Monegain states, "[u]pon information and belief, these complaints were asserted by co-workers and managers who had bias against Ms. Monegain based on her gender and gender expression." (*Id.* ¶ 122.)

On November 20, 2017, the DMV placed Monegain "on paid administrative leave due to the audit investigation." (*Id.* ¶ 133.) In December 2017, Monegain "put in for retirement in lieu of being disciplined as a result of the audit." (*Id.* ¶ 134.) "On January 5, 2018, prior to the effectiveness of the retirement . . . Rena Hussey told Ms. Monegain that she must resign immediately or be terminated as a result of the audit." (*Id.* ¶ 135.) Following this conversation, Monegain "resigned her employment with the DMV, although she communicated to Ms. Hussey that she did not wish to resign but was doing so in lieu of further punishment." (*Id.* ¶ 136.)

---

[10] Monegain explains that "[i]t is appropriate to refer to a transgender woman who has transitioned with female titles, honorifics (e.g., Miss, Ms., or Mrs.), and pronouns (e.g., her, hers, and she)." (Compl. ¶ 29.)

8

Monegain avers, "[o]n information and belief, [she] was the only person whose employment was terminated as a result of the . . . investigation" and that the "DMV's investigation was motivated, instigated, conducted and concluded at the instance of managers and supervisors who harbored animus against Ms. Monegain based on sex and sex stereotyping, including gender and gender expression." (*Id.* ¶¶ 137–38.)

### B.   Procedural Background

On October 1, 2019, Monegain filed her Complaint in this Court.  (Compl., ECF No. 1.) On February 7, 2020, the Individual Defendants jointly filed their Motion to Dismiss for failure to state a claim.  Monegain responded in opposition, and the Individual Defendants replied.

On June 29, 2020, Monegain filed a Motion for Leave to File Notice of Supplemental Authority to the Individual Defendants' Motion to Dismiss (the "Motion for Supplemental Authority").  (ECF No. 28.)  In the Motion for Supplemental Authority, Monegain sought to submit notice of the Supreme Court of the United States' recent decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020).  The Court granted the Motion for Supplemental Authority.  (ECF No. 32.)  Monegain filed her Notice of Supplemental Authority, (ECF No. 33), the Moving Defendants responded, (ECF No. 34), and Monegain replied, (ECF No. 35).

Monegain's twenty-five (25) page Complaint brings five counts against five defendants: the DMV, Hussey, Baxter, Thorpe, and Richard D. Holcomb as Commissioner of the DMV.

> **Count I:**    **Title VII Hostile Work Environment Claim against the DMV.** Monegain was "targeted for harassment and subjected to a hostile work environment by managers and employees because of her sex and sex stereotyping, including gender and gender expression" in violation of Title VII;
>
> **Count II:**    **Title VII Discrimination and Termination Claim against the DMV.**  The DMV created a pretextual audit and threatened to terminate Monegain "for purposes of discrimination based on sex and stereotyping, including gender and gender expression" making

9

Monegain "feel that she was compelled to resign or lose decades of retirement benefits" in violation of Title VII;

**Count III:**    **Title VII Retaliation Claim against the DMV.** The DMV retaliated against Monegain on the basis of sex when it "subjected [her] to a sexually hostile work environment and threatened with and subjected to tangible or adverse employment actions, i.e., her termination" after she engaged in protected activity, in violation of Title VII;

**Count IV:**    **Section 1983 First Amendment Claim against Baxter, Thorpe, and Hussey.** Defendants Baxter, Thorpe, and Hussey, acting under color of state law, retaliated against Monegain for "wearing clothing appropriate to her female gender" and engaging "in speech related to matters of political, social, or other concern to the community" in violation of the First and Fourteenth Amendments; and,

**Count V:**    **Section 1983 Equal Protection and Due Process Clause Claim.** Defendants Baxter, Thorpe and Hussey violated Monegain's constitutional rights under the Equal Protection and Due Process Clauses when they "[a]s a result of Plaintiff's gender and gender expression . . . intentionally targeted [Monegain] for differential treatment and adverse employment actions."

(Compl. ¶¶ 145, 165, 167, 174, 181, 183, 199.)

Monegain asks the Court to "[p]ermanently enjoin Defendant DMV, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against employees who are transgender or gender nonconforming." (*Id.* 23.) Monegain also seeks compensatory damages, reinstatement at the DMV, back pay, attorneys' fees, payment of past and future compensatory pecuniary and non-pecuniary losses, and "additional relief as justice may require." (*Id.*)

## II.  Standard of Review:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356

10

(1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

11

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011)).

### III. Analysis

The Motion at issue pertains only to the counts lodged against the Individual Defendants: Counts IV and V. The Court will grant in part and deny in part the Individual Defendants' Motion to Dismiss. First, as to Count IV, the Court finds that Monegain states a claim for First Amendment retaliation against Hussey and Baxter, but not Thorpe. Second, as to the Equal Protection Claim in Count V, the Court determines that Monegain states a claim for a violation of the Equal Protection Clause for differential treatment on the basis of sex against Baxter but not against Hussey and Thorpe. Third, as to the Due Process Claim in Count V, the Court finds that Monegain does not state a claim against the Individual Defendants because she has not specified what property or liberty interest the Individual Defendants deprived her of nor demonstrated that the available Virginia State Grievance Procedures were inadequate for addressing any deprivation that might have occurred.

Finally, the Court will deny as moot the Individual Defendants' Motion to Dismiss as to its qualified immunity defense of Hussey and Baxter's actions. In the light of the Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) and the United States Court of Appeals for the Fourth Circuit's decision in *Grimm v. Gloucester County School Board*, No. 19-1952, 2020 WL 5034430 (4th Cir. Aug. 26, 2020), as amended (Aug. 28, 2020),

the Court will allow Defendants Hussey and Baxter to refile a Motion to Dismiss concerning their qualified immunity defense as to Monegain's claims against them.

A.   **Count IV:  First Amendment Retaliation**

The Court will grant in part and deny in part the Individual Defendants' Motion to Dismiss as to Count IV.  The Court will grant the Motion to Dismiss as to Thorpe and deny the Motion to Dismiss as to Hussey and Baxter.

1.   **Legal Standard:  First Amendment Retaliation Against Public Employees**

"[A] First Amendment retaliation claim under § 1983 consists of three elements:  (1) the plaintiff engaged in constitutionally protected First Amendment activity, (2) the defendant took an action that adversely affected that protected activity, and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537 (4th Cir. 2017); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (accord).[11]

Regarding public employees, "[t]he First Amendment protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of

---

[11] The Court considers only whether Monegain has stated a First Amendment Retaliation Claim.  To be sure, "[t]o prevail on such a claim, a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks and citation omitted). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*  Further discovery may shed light on whether or not Monegain can meet this "rigorous" requirement, but without further discovery, the Court cannot speculate as to the outcome of what Monegain may be able to prove. *Tobey v. Jones*, 706 F.3d 379, 391 (4th Cir. 2013).  The Court will, however, consider whether each individual defendant—Hussey, Thorpe, and Baxter—could be held responsible for the decision to force Monegain to resign for purposes of this Motion to Dismiss.

13

that right." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (internal quotations and citations omitted). Therefore, "[t]he First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998).

Public employees' right of expression is not without limits. The government retains an interest in "effectiveness, efficiency, order, and the avoidance of disruption" and therefore "has an interest in regulating the speech of its employees." *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 145 (1983). In weighing a public employee's right to speak on a matter of concern against the government's interest in promoting efficient administration, courts in the Fourth Circuit apply a three-part test (the "*McVey* test"), determining:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employer's [adverse employment] decision.

*Adams*, 640 F.3d at 561–62 (quoting *McVey*, 157 F.3d at 277–78).

As to the first *McVey* factor, that the public employee was "speaking as a citizen on a matter of public concern," a litigant may not advance a First Amendment retaliation cause of action concerning a matter of mere personal interest. *Id.* at 561 (quoting *McVey*, 157 F.3d at 277). For a First Amendment retaliation claim, "whether the speech addressed a matter of public concern, is 'the threshold question.'" *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012) (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004) (citation omitted). In determining whether an employee's speech or activity addresses a matter of public concern, the court must

14

consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.

With respect to the second *McVey* factor, "whether the employee's interest in speaking . . . outweighed the government's interest in providing effective and efficient services to the public," *Adams,* 640 F.3d at 561–62 (quoting *McVey*, 157 F.3d at 277–78), courts must review this fact-specific inquiry, in light of the actors involved and their relationships. *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006). In weighing this factor, the court must take into account the "employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency."[12] *McVey,* 157 F.3d at 278 (citation omitted). An employee "who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee." *Id.*

As to the third element, "whether the employee's speech was a substantial factor in the employer's [adverse employment] decision," *Adams*, 640 F.3d at 562 (quoting *McVey*, 157 F.3d at 277–78), a plaintiff must allege facts sufficient to show a causal connection between the First Amendment activity and the alleged adverse action. *See Constantine v. Rectors & Visitors of*

---

[12] The *McVey* Court also set out nine factors relevant to this inquiry, including:

whether the employee's speech (1) impairs discipline by superiors; (2) impairs harmony among co-workers; (3) has a detrimental impact on close working relationships; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the responsibilities of the employee within the agency; and (9) makes use of the authority and public accountability the employee's role entails.

*McVey*, 157 F.3d at 278 (internal quotations and citation omitted).

*George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [his or] her engaging in protected activity." *Id.* (citation omitted). However, "'[k]nowledge alone . . . does not establish a causal connection' between the protected activity and the adverse action." *Id.* (citation omitted). "There must also be some degree of temporal proximity to suggest a causal connection." *Id.*

### 2.     Monegain States a Claim for First Amendment Retaliation Against Hussey and Baxter But Not Thorpe

Viewing her allegations favorably, Monegain has stated a First Amendment retaliation claim against Hussey and Baxter. Monegain asserts facts showing that she spoke, in presenting as a female, as a citizen "upon a matter of public concern," and that her speech in this manner "outweighed the government's interest" in providing services to the public. *Adams*, 640 F.3d at 561–62 (quoting *McVey*, 157 F.3d at 277–78). However, the Complaint does not allege that Thorpe was involved in any adverse action taken against Monegain. *Id.*; *Constantine*, 411 F.3d at 501.

#### a.     Monegain Asserts Facts That She Spoke Upon a Matter of Public Concern When She Presented as a Female at the DMV

The Court first addresses the "threshold question" of whether Monegain's presentation as a female "addressed a matter of public concern." *Brooks*, 685 F.3d at 371. The Court finds that the Complaint asserts sufficient facts plausibly demonstrating that Monegain's presentation as female constitutes speech regarding a matter of public concern, satisfying the first *McVey* factor.

Courts have defined "matters of public concern" broadly, finding that "[s]peech deals with matters of public concern when it can be fairly considered as relating to *any* matter of

political, social, or other concern to the community." *Haley*, 738 F.3d at 122 (emphasis added) (quoting *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011)).

Regarding dress or physical expression as a matter of public concern, conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Texas v. Johnson*, 491 U.S. 397, 404–05 (1989) (recognizing expressive conduct in students wearing black armbands to protest American military involvement in Vietnam, sit-ins at "whites only" lunch counters to protest segregation, and wearing pants with small American flag sewn into their seat). The United States Court of Appeals for the Second Circuit has noted that "a particular style of dress may be a sufficient proxy for speech." *Zalewska v. Cnty. of Sullivan*, 316 F.3d 314, 320 (2d Cir. 2003). While ordinary clothing decisions in the workplace may not enjoy constitutional protections, the *Zalewska* Court differentiated cases in which the style of dress sent "a clear contextual message" such as when students wore black armbands to protest the Vietnam War. *Id*. The Second Circuit noted with approval a Massachusetts state court case determining that a "male high school student's decision to wear traditionally female clothes to school as an expression of female gender identity was protected speech" as that decision "sent a clear and particular message about the plaintiff's gender identity." *Id*. (citing *Doe ex rel. Doe v. Yunits*, No. 001060A, 2000 WL 33162199, at *1 (Mass. Super. Ct. Oct. 11, 2000)). As the Second Circuit observed, "[t]his message was readily understood by others . . . because it was such a break from the norm." *Id*.

The Complaint includes facts, especially considering this persuasive case law, showing that Monegain's decision to "begin presenting" as a female was intended to communicate a message of public concern about her gender identity and gender expression. (Compl. ¶ 62.) Monegain informed Baxter of her plan to "begin presenting" this message, (*id*.), and the

Complaint contains facts showing that Monegain's coworkers responded to her message, (*id.* ¶¶ 73–77, 80–82), often in a negative light. At this procedural posture, the Court may infer, as other courts have, that Monegain's decision to begin "presenting" as a female at work "sent a clear and particular message about [Monegain's] gender identity." *Zalewska,* 316 F.3d at 320; *see also Brown v. Kroll*, No. 8:17cv294, 2017 WL 4535923, at *7 (D. Neb. Oct. 10, 2017) (finding *Zalewska* persuasive and determining an inmate had stated a First Amendment retaliation claim for "expressing her . . . transgender rights to access and wear female undergarments"); *Kastl v. Maricopa Cnty. Cmty. Coll. Dist.*, No. 02cv1531, 2004 WL 2008954, at *9 (D. Ariz. June 3, 2004) (finding transgender woman's stated desire to use male restroom was speech of "public concern" sufficient to state First Amendment retaliation claim).

Furthermore, looking to the "the content, form, and context of [Monegain's speech] as revealed by the whole record," the Complaint plausibly alleges that Monegain's speech may be "fairly considered as relating to *any* matter of political, social, or other concern to the community" because it reflected the public manifestation of her gender expression. *Connick,* 461 U.S. at 147–48 (emphasis added). Monegain's decision to begin "presenting" as female occurred roughly five months after she informed Baxter, her supervisor, "that she was transgender" but "asked Baxter to keep this information private." (Compl. ¶¶ 34–35, 62.) After a several-months long process, during which Monegain finalized her name change, "became Tracy Monegain," (*id.* ¶ 46), and procured a new drivers' license and social security card reflecting her gender and female identity, Monegain decided to begin "presenting" to her coworkers and the world, (*id.* ¶ 62).

These assertions plausibly show that Monegain's decision to begin presenting as female, and resulting speech, was not a "matter of personal interest" or one limited to her employment,

18

as the Individual Defendants claim, but a thoughtful ultimate expression of her gender identity to society. *Adams*, 640 F.3d at 561 (quoting *McVey*, 157 F.3d at 277). This case bears a number of similarities to the *Kastl* decision, where the United States District Court for the District of Arizona denied a community college's motion to dismiss a First Amendment retaliation claim after it had fired a transgender woman for refusing to use the men's restroom. *Kastl*, 2004 WL 2008954, at *1, *9. As the *Kastl* Court stated, the transgender female plaintiff's expression of her gender identity was not a matter of private concern or grounded in the "minutiae of workplace life." *Id.* at *9. Rather, "[e]xpression of her gender and change of gender occurs both on and off the job, is directed to the public at large as well as her co-workers, and cannot be said to be 'about' her employment." *Id.* "[H]er attire may be understood as an expression of her change in gender identity, as it is clearly understood as such by her employer and the restroom patrons who complained of her use of the women's restroom." *Id.* at *9 n.3. Monegain's expression of a female identity through feminine dress, like the *Kastl* plaintiff's use of the female restroom while dressed in female attire, was expressive of her gender to the "public at large." *Id.* at *9.

Indeed, numerous federal district courts have found that speech relating to the Lesbian, Gay, Bi-Sexual, Transgender, and Questioning ("LGBTQ") community, whether spoken or un-spoken, involves political messaging that falls within the ambit of First Amendment protection. *Young v. Giles Cnty. Bd. of Educ.*, 181 F. Supp. 3d 459, 464 (M.D. Tenn. 2015) (finding that prohibition on shirt reading "'Some People Are Gay, Get Over It'" was a regulation of "student speech on a matter of political importance"); *Gillman v. Sch. Bd. for Holmes Cnty., Fla.*, 567 F. Supp. 2d 1359, 1369–75 (N.D. Fla. 2008) (invalidating school ban on wearing or displaying symbols or slogans advancing the fair treatment of homosexual people); *Henkle v. Gregory*, 150

19

F. Supp. 2d 1067, 1075 (D. Nev. 2001) (finding gay student had stated claim for First Amendment retaliation after he "participated in a discussion about gay high school students and their experiences" on a local access channel and was transferred to another school); *Chambers v. Babbitt*, 145 F. Supp. 2d 1068, 1072 (D. Minn. 2001) (rejecting a school board ban on a t-shirt with the message "Straight Pride").  While Monegain did not explicitly convey her sexual and gender orientation via text on a t-shirt, her presentation as a female conveyed a similar message of "public concern" that falls within the protection of the First Amendment. *Brooks*, 685 F.3d at 371.

Monegain alleges sufficient facts plausibly stating that her presentation in dress associated with the female gender was speech "upon a matter of public concern" and not just speech "as an employee about a matter of personal interest." *Adams*, 640 F.3d at 561–62 (quoting *McVey*, 157 F.3d at 277–78).  Monegain has satisfied the first *McVey* factor.

> **b.    Monegain Asserts Facts Plausibly Alleging That Her Interest in Presenting as a Female Outweighed the Government's Interest in Prohibiting Her Expressive Conduct**

Monegain states sufficient facts, at this procedural posture, to plausibly plead that her "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public." *Adams*, 640 F.3d at 561–62 (quoting *McVey*, 157 F.3d at 277–78).  The Fourth Circuit has stated that in assessing the second *McVey* factor, courts should "consider the context of the speech, the employee's role in the workplace, and [the] organization's mission." *Mills v. Steger*, 64 F. App'x 864, 872 (4th Cir. 2003) (citing *McVey*, 157 F.3d at 278).

At this procedural posture, Monegain shows that her speech outweighed the DMV's interest in prohibiting her conduct.  First, looking to the context of Monegain's speech and the

DMV's mission, nothing in the Complaint suggests that Monegain's decision to present as a female at work caused excess disruption or interfered with the DMV's mission of providing services to Virginia residents. While some coworkers complained about Monegain's decision to present as a female, no factual basis exists to conclude that her speech "disrupt[ed] the operation and mission of the agency." *McVey*, 157 F.3d at 278.

Second, Monegain's role in the organization also supports the inference that her interest outweighed the government's interest in providing services to the public. The DMV employed Monegain as a "Technical Services Supervisor." (Compl. ¶¶ 2–3.) The allegations in the Complaint do not support a reasonable inference that Monegain's role involved a "confidential, policymaking, or public contact role . . . [that] enjoys substantially less First Amendment protection than does a lower level employee." *McVey*, 157 F.3d at 278. Given Monegain's apparently limited confidential and policymaking role within the DMV, the Court may infer at this procedural posture that her interest in expressive speech outweighed the government interest in limiting that speech.

Monegain asserts sufficient facts to support the plausible inference that her "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public." *Adams*, 640 F.3d at 561–62 (quoting *McVey*, 157 F.3d at 277–78). Monegain satisfies the second *McVey* factor.

      c.      **Monegain Asserts Facts to Plausibly Allege That Her Speech Was a Substantial Factor in Hussey and Baxter's Adverse Actions Against Her, But Does Not Show that Thorpe Took an Adverse Action Against Her**

Monegain asserts sufficient facts to show that her speech was a substantial factor in Baxter and Hussey's adverse actions against her but does not state facts showing that Thorpe took any adverse action against her.

While the Court has, until now, weighed Monegain's interest in her protected speech against the DMV's interest in its government function, Monegain does not bring her First Amendment retaliation claim against the DMV:  she brings it against Hussey, Baxter, and Thorpe in their individual capacities.  To state a claim against these employees as individuals, Monegain must aver facts allowing the Court to "draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  In other words, Monegain must show that Hussey, Baxter, and Thorpe retaliated against Monegain for her protected activity by stating the "causal connection between her First Amendment activity and [an] alleged adverse action." *See Constantine*, 411 F.3d at 501.

"The standard for proving a materially adverse action in the Title VII retaliation context . . . is similar to the standard for demonstrating an adverse action in the First Amendment retaliation context." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 697 n.12 (4th Cir. 2018) (comparing the retaliation standards set forth in Title VII, Title IX, and First Amendment under 42 U.S.C § 1983).  As the Fourth Circuit stated in *Constantine*, "for purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  411 F.3d at 500 (internal quotation marks and citation omitted).  In order to establish a causal connection between her protected speech and the retaliation, Monegain "must show, at the very least, that the [individual] defendant was aware of her engaging in protected activity." *Id.* at 501 (citation omitted).  "There must also be some degree of temporal proximity to suggest a causal connection." *Id.*

In determining whether an action is materially adverse, courts "look at the particular circumstances of the alleged act of retaliation." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 186 (4th

Cir. 2019) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)).

Importantly, "[c]ontext matters." *Burlington*, 548 U.S. at 69. "In many cases—perhaps the

overwhelming majority of cases—the distinction between 'adverse employment action' and

'materially adverse action' is unlikely to change the outcome of a case." *Hinton v. Va. Union

Univ.*, 185 F. Supp. 3d 807, 819 (E.D. Va. 2016). Nonetheless, retaliatory actions must prove

"materially adverse—such that they might have dissuaded a reasonable worker from engaging in

protected activity." *Strothers v. City of Laurel*, 895 F.3d 317, 327–28 (4th Cir. 2018) (internal

citations omitted).

### i. Monegain Plausibly Alleges a Causal Connection Between Her Protected Speech and Hussey's Adverse Action in Forcing Monegain to Resign

First, regarding Hussey, Monegain states sufficient facts to show a causal connection, at

this procedural posture, between Monegain's protected activity and Hussey's involvement in the

DMV's decision to terminate Monegain's employment. Following Monegain's decision to begin

presenting as a female at work after August 1, 2016, she alleges, "[o]n information and belief,"

that Baxter reported instances of "harassment [of Monegain] to . . . Hussey."[13] (Compl. ¶ 92.)

Monegain also states that on January 5, 2018, prior to Monegain's resignation date, Hussey "told

Ms. Monegain that she must resign immediately or be terminated as a result of the audit." (*Id.*

¶ 135.)

---

[13] Although Monegain pleads this fact on information and belief, a "plaintiff is generally
permitted to plead facts based on 'information and belief' if such plaintiff is in a position of
uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi-
Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015) (citation omitted). At this stage of the
litigation, Monegain likely does not have access to internal records of complaints of harassment
at the DMV.

The Complaint thus creates a plausible inference that Hussey was aware, through the complaints reported to her by Baxter, that Monegain was "engaging in protected activity." *Constantine*, 411 F.3d at 501. Furthermore, because a reasonable inference from the Complaint is that Monegain continued to present as a female and thus continued to engage in protected activity after August 1, 2016, the alleged act of retaliation took place within some "temporal proximity" of the protected activity. *Id.* Indeed, Monegain alleges that the Internal Audit investigation did not begin until after she "returned to work from her gender reassignment surgery" and that four of the "anonymous complaints" leading to that investigation occurred while she was on leave for that gender reassignment surgery. (Compl. ¶¶ 120–21.) Because Hussey told Monegain "she must resign immediately or be terminated" while she was engaging in protected activity, Monegain has stated sufficient facts to show a causal connection between her speech and Hussey's involvement in her forced resignation from the DMV. (*Id.* ¶ 135.) Although threadbare, Monegain has met the third *McVey* factor regarding Hussey. Because Monegain has met all three *McVey* factors regarding Hussey, Monegain has stated a claim for First Amendment retaliation against her.

### ii. Monegain Plausibly Alleges a Causal Connection Between Her Protected Speech and Baxter's Adverse Action in Implementing the Dress Code for Monegain

Second, regarding Baxter, Monegain pleads a sufficient causal connection between her protected activity and Baxter's implementation of the Dress Code Policy—a materially adverse action. Monegain plainly states facts showing that Baxter was "aware of her engaging in protected activity." *Constantine*, 411 F.3d at 501. Monegain "advised Baxter that she planned to begin presenting as female at work on August 1, 2016," (*id.* ¶¶ 61–62), and several of

Monegain's co-workers complained of Monegain's presentation as a female to Baxter following August 1, 2016, (*see id.* ¶¶ 75–79).

Reading her Complaint favorably, Monegain also plausibly asserts facts that Baxter took a materially adverse action against her in adopting the Dress Code Policy shortly after Monegain began engaging in that protected activity. Specifically, on August 21, 2016, roughly three weeks after Monegain began engaging in the protected activity, Baxter, in his capacity as a manager at the DMV, informed Monegain of "a new dress code that was written specifically for her by Baxter." (*Id.* ¶ 96.) Monegain states that "no other employee was subject to this dress code." (*Id.* ¶ 97.) Pursuant to the Dress Code Policy, "Ms. Monegain was not allowed to wear dresses, skirts, heels, jeans with any decoration, or, oddly, collars, but was required to always wear a bra and was required to wear a uniform to all Motor Carrier meetings." (*Id.* ¶ 98.) Monegain states that although she "expressed to Baxter that she found this to be discriminatory," she "complied . . . because she wanted to keep her job." (*Id.* ¶¶ 99–100.)

Taking these facts as true and drawing all reasonable inferences in favor of Monegain, Baxter's implementation of the Dress Code Policy represents a materially adverse action because it "might have dissuaded a reasonable worker from engaging in protected activity." *Strothers*, 895 F.3d at 327–28. Importantly, considering the context of this action, a reasonable transgender employee might have been dissuaded from engaging in protected activity if he or she knew that as a consequence of their expressive speech they would no longer be able to express their gender in their day-to-day life. Because Monegain's outward presentation as a female could potentially "be understood as an expression of her change in gender identity," *Kastl*, 2004 WL 2008954, at *9, the Dress Code Policy—by stopping her from wearing "dresses, skirts, heels, [or] jeans with any decoration"—permits the plausible inference of interference with a core aspect of

25

Monegain's identity by preventing her from presenting as a female at work, (Compl. ¶ 98). Given the context of the matter at bar, Baxter's alleged implementation of the Dress Code Policy constituted an adverse action, satisfying the third prong of the *McVey* test.

> ### iii. Monegain Does Not Allege a Causal Connection Between Her Protected Speech and Any Adverse Action Taken by Thorpe

Finally, regarding Thorpe, the Complaint does not contain sufficient factual allegations for the Court to infer that Thorpe took any adverse action against Monegain in retaliation for her engaging in protected speech. Monegain places three allegations about Thorpe in the Complaint: (1) "Baxter told Ms. Monegain that . . . Thorpe, the DMV's Director of HR, had stated . . . that 'If we let 'it' do this, then they will all come out;'" (2) that Monegain "was shocked and upset by Thorpe's statement and her antipathy toward Ms. Monegain;" and, (3) that Baxter reported instances of harassment, directed towards Monegain, to Thorpe. (*Id.* ¶¶ 69, 70, 93.)

The above facts, even read favorably, do not plausibly establish that Thorpe was involved in any materially adverse action against Monegain. The Complaint does not allege that Thorpe was involved in the implementation of the Dress Code Policy, (*id.* ¶¶ 96–100), the allegedly pretextual audit of Monegain, (*id.* ¶¶ 120–34), or the decision to force Monegain to retire, (*id.* ¶¶ 135–39). The Court cannot infer that Monegain has stated a causal connection between her speech and any adverse action and met the third *McVey* factor. Monegain fails to state a claim that Thorpe is liable for the misconduct alleged in the Complaint. *Iqbal*, 556 U.S. at 678.

In sum, the Court determines that Monegain has met the *McVey* test as to Hussey by pleading facts sufficient to show that Monegain engaged in speech on a matter of public concern, that her speech on the matter outweighed the DMV's interest in prohibiting that speech, and that a causal connection existed between her speech and Hussey's role in the DMV's decision to

force Monegain to resign and Baxter's role in the implementation of the Dress Code Policy. *Adams*, 640 F.3d at 561–62 (quoting *McVey*, 157 F.3d at 277–78).  Because Monegain fails to state a causal connection between Thorpe's conduct and any adverse action taken against Monegain, the Court will dismiss Count IV against Thorpe without prejudice and allow Count IV to proceed against Hussey and Baxter.

**B.**    **Count V:  Equal Protection Clause Claim Pursuant to § 1983**

The Court will grant in part and deny in part the Individual Defendants' Motion to Dismiss as to Count V.[14]  The Court determines that Monegain states a cognizable Equal Protection claim against Baxter for his implementation of the Dress Code Policy but does not state a claim for violation of the Equal Protection Clause against Thorpe or Hussey.

**1.**    **Legal Standard:  Equal Protection and Discrimination on the Basis of Sex**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  State action "is unconstitutional when it creates arbitrary or irrational distinctions between classes of people out of a bare desire to harm a politically unpopular group." *Grimm v. Gloucester Cnty. Sch. Bd.*, No. 19-1952, 2020 WL 5034430, at *13 (4th Cir. Aug. 26, 2020), as amended (Aug. 28, 2020) (internal citations, quotations, and alterations omitted).  The Fourth Circuit has determined that policies affecting transgender individuals are

---

[14] In Count V, Monegain brings a claim pursuant to the Equal Protection Clause and a claim pursuant to the Due Process Clause, although she does not specify whether she brings a Fifth Amendment Due Process Clause claim or Fourteenth Amendment Due Process Clause Claim.  The Court will analyze the two claims brought in Count V separately.

27

subject to "intermediate scrutiny" because such policies "rest[] on sex-based classifications and because transgender people constitute at least a quasi-suspect class." *Id.* Because they are subject to intermediate scrutiny, sex-based classifications "fail unless they are substantially related to a sufficiently important governmental interest." *Id.* (quoting *City of Cleburne*, 473 U.S. at 441). When applying intermediate scrutiny to a sex-based classification, the government bears the burden of demonstrating that its proffered justification for its use of the classification is "'exceedingly persuasive.'" *United States v. Virginia*, 518 U.S. 515, 532–33 (1996) (citation omitted).

"In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he [or she] was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Ath., Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) (citations omitted); *see also Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) ("To succeed on an equal protection claim, a plaintiff must first demonstrate that he [or she] has been treated differently from others with whom he [or she] is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.") Once a plaintiff shows differential treatment and animus, the court "proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Garraghty*, 239 F.3d at 654 (citations omitted).

### 2. Monegain States a Claim Pursuant to the Equal Protection Clause Against Baxter, but Not Hussey and Thorpe

Monegain states a claim pursuant to the Equal Protection Clause against Baxter, but not Hussey and Thorpe. To state a claim for an Equal Protection violation, Monegain must allege facts that show Monegain: (1) "was treated differently from others who were similarly situated;" (2) that differential treatment was the "result of discriminatory animus;" and, (3) the disparity in

28

treatment cannot be justified under intermediate scrutiny. *Garraghty*, 239 F.3d at 654; *Equity in Ath., Inc.*, 639 F.3d at 108.

The Court first discusses the Equal Protection claim against Baxter, finding that Monegain successfully presents an Equal Protection claim against him in relation to his conduct in implementing the Dress Code Policy. The Court then turns to the Equal Protection claims against Hussey and Thorpe, determining that Monegain fails to state a claim against either under the Equal Protection Clause.

### a. Monegain States an Equal Protection Claim Against Baxter

Monegain alleges facts, taken as true, that state an Equal Protection claim against Baxter. As discussed above, the Complaint alleges that Baxter, in his capacity as a manager at the DMV, informed Monegain of "a new dress code that was written specifically for her by Baxter." (Compl. ¶ 96.) Monegain maintains that "no other employee was subject to this dress code." (*Id.* ¶ 97.) Three weeks after beginning to present as female at work, Baxter enacted the Dress Code Policy by which "Ms. Monegain was not allowed to wear dresses, skirts, heels, jeans with any decoration, or, oddly, collars, but was required to always wear a bra and was required to wear a uniform to all Motor Carrier meetings." (*Id.* ¶ 98.)

Monegain asserts that although she "expressed to Baxter that she found this to be discriminatory," she "complied with the dress code because she wanted to keep her job." (*Id.* ¶¶ 99–100.) In her Equal Protection claim, Monegain avers that "[a]s a result of [Monegain's] gender and gender expression, Defendant intentionally targeted Plaintiff for differential treatment and adverse employment actions." (*Id.* ¶ 199.)

> **i.  Monegain States Facts That She Was Treated Differently from Similarly Situated Individuals Because of Sex and Her Transgender Status**

Taking these allegations as true, Monegain has stated a claim against Baxter under the Equal Protection Clause. The Dress Code Policy, as alleged, discriminated on the basis of sex because it prevented Monegain from dressing in clothing appropriate to her gender. In reaching this conclusion, the Court relies on two cases undecided at the time of the Parties' briefing: the Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) and the Fourth Circuit's decision in *Grimm v. Gloucester County School Board*, No. 19-1952, 2020 WL 5034430 (4th Cir. Aug. 26, 2020), as amended (Aug. 28, 2020).

First, in *Bostock v. Clayton County, Georgia*, the Supreme Court decided that in the context of Title VII that discrimination against a person for being transgender is discrimination "on the basis of sex." 140 S. Ct. at 1737. The Supreme Court noted that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."[15] *Id.* at 1741. While recognizing that "homosexuality and transgender status are distinct concepts from sex," Justice Gorsuch, writing for the majority, determined that "[b]y discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today. Any way you slice it, the employer intentionally refuses to hire applicants in part because of the affected individuals' sex." *Id.* at 1746.

Second, on August 26, 2020, two months after the Supreme Court's decision in *Bostock*, the Fourth Circuit issued its opinion in *Grimm v. Gloucester County School Board.* 2020 WL

---

[15] Notably, in one of the consolidated cases resolved in *Bostock*, a woman who had formerly presented as a male was fired by her employer, a funeral home, after notifying it that she intended to "live and work full-time as a woman." 140 S. Ct. at 1738.

5034430.  In that case, the high school student plaintiff, Gavin Grimm, initially enrolled in

school as a female.  *Id.* at *5.  During his freshman year, Grimm who "was identified as female"

at birth, "disclosed to his mother that he was transgender" and began "expressing his male

identity in all aspects of his life" including using male restrooms.  *Id.*  With permission from

school administrators, Grimm began using the male restroom until complaints from various

parents led the School Board to issue a policy stating that:

> [i]t shall be the practice of the [school district] to provide male and female restroom
> and locker room facilities in its schools, and the use of said facilities shall be limited
> to the corresponding biological genders, and students with gender identity issues
> shall be provided an alternative appropriate private facility.

*Id.* at *6.  Following adoption of this policy, Grimm was no longer allowed to use the male

restrooms.  *Id.*  Grimm filed suit bringing claims under the Equal Protection Clause and Title IX.

The Fourth Circuit affirmed the district court's grant of summary judgment as to both counts.  As

to the Equal Protection claim, the Fourth Circuit found "that heightened scrutiny applies to

Grimm's claim because the bathroom policy rests on sex-based classifications *and* because

transgender people constitute at least a quasi-suspect class."  *Id.* at *13 (emphasis in original).

In so ruling, the Fourth Circuit agreed with the "Seventh and now Eleventh Circuits that

when a 'School District decides which bathroom a student may use based upon the sex listed on

the student's birth certificate,' the policy necessarily rests on a sex classification."  *Id.* at *14

(citation omitted).  As the district court held, "'Grimm was subjected to sex discrimination

because he was viewed as failing to conform to the sex stereotype propagated by the Policy.'"

*Id.*  In doing so, the Fourth Circuit held that "policies [that] punish transgender persons for

gender nonconformity, thereby relying on sex stereotypes" are unconstitutional.  *Id.* (citation

omitted).  The Fourth Circuit also held that "it is apparent that transgender persons constitute a

quasi-suspect class" and heightened scrutiny was appropriate for assessing the School Board's

restroom policy. *Id.* at *16. In making that assessment, the Fourth Circuit relied on a four-factor assessment:

> [f]irst . . . whether the class has historically been subject to discrimination . . . . [s]econd . . . [whether] the class has a defining characteristic that bears a relation to its ability to perform or contribute to society . . . . [t]hird . . . whether the class may be defined as a discrete group by obvious, immutable, or distinguishing characteristics . . . . And fourth . . . whether the class is a minority lacking political power.

*Id.* (internal citations and quotations omitted). The Fourth Circuit found that each of the four-factor test was "readily satisfied" in the case of transgender persons, and that "transgender persons constitute a quasi-suspect class."[16] *Id.* at *16, *18.

Applying these decisions, the Court concludes that the Dress Code Policy treated Monegain differently from others who were similarly situated. First, applying both *Bostock* and *Grimm*, the Dress Code Policy discriminated on the basis of sex. Like the bathroom policy in *Grimm*, the Dress Code Policy, as alleged, "necessarily rests on a sex classification," *id.* at *14, as it prevented Monegain from expressing her gender through feminine dress and appearance in a manner that did not conform with the sex listed on her birth certificate. The Dress Code Policy, like the restroom policy in *Grimm*, thus plausibly instituted a sex classification that "punish[ed] a transgender person[] for gender nonconformity" with that classification—in this case, not dressing in the "appropriate" gendered clothing. *Id.* As alleged in the Complaint, the Dress Code Policy targeted Monegain for "failing to conform to the sex stereotype" expected of

---

[16] In reaching this conclusion, the Fourth Circuit found, as other courts had, that "one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Grimm*, 2020 WL 5034430, at *16 (internal quotation marks and citation omitted).

employees at the DMV, and under that interpretation, Baxter treated Monegain differently because of her sex.[17]

Similarly, pursuant to *Bostock*, because the Dress Code Policy discriminated against Monegain on the basis of "one sex identified at birth and another today" by forcing Monegain to wear clothes that were inappropriate to her gender, the Dress Code Policy discriminated on the basis of sex. 140 S. Ct. at 1737. Under either decision, at this procedural posture, the Dress Code Policy impermissibly treated Monegain differently on the basis of sex. Monegain has thus stated facts showing that Baxter subjected her to differential treatment.

Second, considering Monegain's allegations in light of the *Grimm* Court's ruling that transgender persons constitute a quasi-suspect class, the Dress Code Policy plausibly targeted transgender persons by making Monegain subject to a dress code that prevented her from expressing her gender.[18]  *Grimm*, 2020 WL 5034430, at *16. Pursuant to either approach, the

---

[17] The Individual Defendants argue that these allegations are "deficient in that they fail to identify that Baxter treated Monegain differently than another female employee in the same position." (Mem. Supp. Mot. Dismiss 15, ECF No. 20.) But Monegain specifically alleges that "no other employee was subject to this dress code." (*Id.* ¶ 97.) Reading that statement favorably, Monegain asserts that no other female employee, as well as male, was subject to the Dress Code Policy. And the Complaint identifies numerous other women that worked at the DMV, as well as Thorpe and Hussey. (*See id.* ¶¶ 88–89.) Given this allegation, the Court may reasonably infer that no other female employee was subject to the Dress Code Policy, and that Monegain was treated differently from other female employees based on her transgender status.

[18] The Individual Defendants argue that Monegain cannot bring an Equal Protection claim as a "'class of one,' where a Plaintiff does not allege membership in a class or group but was treated differently than similarly situated neighbors for 'irrational and wholly arbitrary' reasons." (Reply Mot. Dismiss 8, ECF No. 24 (quoting *Village of Westbrook v. Olech*, 528 U.S. 562, 564–65 (2000).) The Supreme Court has held that such a "'class-of-one' theory" of equal protection is ill-suited to the public employment context where there is "no assertion that the different treatment was based on the employee's membership in any particular class." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594 (2008). Here, however, Monegain *does* allege membership in a "particular class." *Id.* Monegain states that she "is a woman who is transgender" and, in relation to her Equal Protection claim, that "[a]s a result of [Monegain's]

Court finds that Monegain has satisfied the first prong of an Equal Protection violation by showing that Baxter treated her differently on account of her sex or on account of her transgender status.  If the Court finds that the Dress Code Policy was motivated by discriminatory animus, the Court must apply intermediate scrutiny.

### ii. Monegain States Facts That She Was Treated Differently Due to Discriminatory Animus on the Part of Baxter

Second, under the second prong of an Equal Protection violation, Monegain asserts sufficient facts to plausibly raise the inference that Baxter implemented the Dress Code Policy because he harbored discriminatory animus against Monegain for her transgender status.  The Complaint contains several allegations that, taken as true, show that Baxter implemented the policy due to animus towards Monegain as a transgender woman.

For instance, Monegain states that after she reported a conversation to Baxter in which her subordinates called her "'gay'" and a "'faggot,'" Baxter told Monegain "that it was just 'boys being boys'" and took no action to address the conversation.  (Compl. ¶¶ 39, 43–44, 46.)

Furthermore, in initial conversations with Baxter after revealing that she was transgender, Monegain reports that Baxter appeared "upset with Ms. Monegain because of her gender and gender expression."  (*Id.* ¶ 52.)  Monegain also states that after she initially told Baxter about being transgender Baxter offered her a transfer which "would constitute a demotion in that it would remove all her direct reports."  (*Id.* ¶ 47.)  Monegain avers that the "intent and effect of the transfer was to remove [her] from public view because of her gender and gender expression, and an attempt to hide her from public view in order to avoid the need for the DMV to take

---

gender and gender expression, Defendant intentionally targeted Plaintiff for differential treatment and adverse employment actions."  (Compl. ¶¶ 19, 199.)

prompt and effective action to stop the harassment." (*Id.* ¶ 49.)  Finally, after Monegain's name change became final, Monegain asserts that Baxter "told her to keep signing . . . documents with her prior name" and "began to misgender Ms. Monegain and refer to her by her previous male name in public, though he did not do so in private." (*Id.* ¶¶ 59, 115.)  And as alleged, Baxter's previous attempts to remove Monegain "from public view" and previous incidents in which he misgendered Monegain and treated her as a male show sufficient animus, at this stage, to state a claim.  (*Id.* ¶¶ 49, 59, 115.)

These allegations plausibly show that Baxter implemented the Dress Code Policy based on discriminatory animus toward Monegain as a transgender woman and are sufficient to meet the second prong of the Equal Protection violation analysis.

### iii. Monegain States Facts That Show at This Stage of the Litigation that the Disparity in Treatment Cannot Be Justified Under Intermediate Scrutiny

Third, considering the allegations in the Complaint under the requisite level of scrutiny, no basis exists to conclude that Baxter's policy was substantially related to a sufficiently important government interest.  On this element, the Individual Defendants do not proffer any rationale that this Court may consider that would support a government interest in the Dress Code Policy as alleged.[19]

Because on these facts, the government has not borne its "burden of demonstrating that its proffered justification for its use of the classification is 'exceedingly persuasive,'" *Virginia*,

---

[19] In briefing, the Individual Defendants appear to assert that the Dress Code Policy was not discriminatory because the individuals in Monegain's department wore uniforms.  (Reply Mot. Dismiss 6.)  The Court cannot consider facts outside the Complaint when resolving a motion to dismiss.  *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) ("A motion to dismiss tests the sufficiency of a complaint . . . and our evaluation is thus generally limited to a review of the allegations of the complaint itself.") (internal quotation marks and citation omitted).

518 U.S. at 533, the Court concludes that Monegain has stated an Equal Protection claim against Baxter in his individual capacity. The Court will deny the Individual Defendants' Motion to Dismiss as to Baxter on this ground.

b.    **Monegain Does Not State an Equal Protection Claim Against Hussey Because She Fails to Allege Discriminatory Animus**

The Court finds that Monegain does not state a claim against Hussey under the Equal Protection Clause because she does not allege any facts showing that Hussey harbored "discriminatory animus" towards her. *Equity in Ath., Inc.*, 639 F.3d at 108.

Monegain maintains that Baxter reported certain instances of harassment to Hussey, (Compl. ¶ 92), and that on January 5, 2018, Hussey "told Ms. Monegain that she must resign immediately or be terminated as a result of the audit," (*id.* ¶ 135). Regardless of what actions Hussey may have taken against Monegain, these allegations do not plausibly show any "discriminatory animus" on the part of Hussey towards Monegain. *Equity in Ath., Inc.*, 639 F.3d at 108. Reading these allegations liberally, at best they demonstrate that Hussey knew of Monegain's transgender status and that Hussey forced Monegain to resign. But such facts alone are insufficient to state discriminatory animus under the Equal Protection Clause. *See Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 81 (4th Cir. 2016) (finding district court's dismissal of Equal Protection claim to be proper where there was "no allegation of overt discriminatory animus" and plaintiff only alleged that defendants "had knowledge of [plaintiff's] sexual orientation").

Because Monegain does not state facts showing that Hussey harbored overt discriminatory animus towards her, the Court finds that Monegain has not stated a claim for violation of the Equal Protection Clause against her. The Court will grant the Individual Defendants' Motion to Dismiss as to Hussey on this ground.

      **c.**    **Monegain Does Not State an Equal Protection Claim Against Thorpe Because She Fails to Allege How Thorpe Treated Her Differently from Any Similarly Situated Individuals**

As with Monegain's First Amendment retaliation claim against Thorpe, her Equal Protection claim falters because she does not assert facts showing that Thorpe took or implemented any action that "treated [Monegain] differently from others who were similarly situated" of Monegain's transgender status. *Equity in Ath., Inc.*, 639 F.3d at 108.

As stated before, Monegain submits three allegations against Thorpe in her Complaint: (1) "Baxter told Ms. Monegain that . . . Thorpe, the DMV's Director of HR, had stated . . . that 'If we let 'it' do this, then they will all come out;'" (2) that Monegain "was shocked and upset by Thorpe's statement and her antipathy toward Ms. Monegain;" and, (3) that Baxter reported instances of harassment, directed towards Monegain, to Thorpe. (*Id.* ¶¶ 69, 70, 93.) While these factual allegations might evince antipathy towards Monegain, they do not show that Thorpe played any meaningful role, or any role at all, in the Dress Code Policy or the decision to force Monegain to resign.[20]

Because Monegain does not assert that Thorpe implemented any conduct, action, or policy that "treated [Monegain] differently from others who were similarly situated" on the basis of her gender. *Equity in Ath., Inc.*, 639 F.3d at 108, Monegain has not stated an Equal Protection claim against her. The Court will grant the Individual Defendants' Motion to Dismiss as to Thorpe on this ground.

---

[20] In her Response to the Motion to Dismiss, Monegain does not elaborate how these bare factual allegations connect Thorpe to any alleged Equal Protection violation in the Complaint. (Resp. Mot. Dismiss 15, ECF No. 23.)

## C.    Count V:  Due Process Clause Claim Pursuant to § 1983

The Court will deny Monegain's Due Process claims without prejudice.  As currently pled, Monegain has not alleged with particularity the elements of either a procedural or substantive due process claim.

As an initial matter, Monegain does not plainly state whether she brings her claims under the Fifth Amendment Due Process Clause or the Fourteenth Amendment Due Process Clause. Furthermore, she does not specify whether she brings a claim under a right to Substantive Due Process or Procedural Due Process.

### 1.    Monegain Does Not Plead a Procedural Due Process Claim

Assuming Monegain brings her claims under the Fourteenth Amendment Due Process Clause, to state a procedural due process claim, Monegain must demonstrate:  "(1) [she] had property or a property interest; (2) of which [Defendants] deprived [her]; (3) without due process of law." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 826 (4th Cir. 1995).

On the facts alleged, Monegain fails to state a procedural due process claim.  First, Monegain does not state in her Complaint, plainly, what liberty[21] or "property interest" she was "deprived" of by the Individual Defendants.  *Id.*  Second, Monegain does not articulate which of the Individual Defendants "deprived" her of this liberty or "property interest."  *Id.*  Indeed, Count V only refers to a "Defendant" in a singular manner—seemingly referring to Defendant DMV— even though Monegain brings Count V only against Baxter, Hussey, and Thorpe in their individual capacities.  (*See* Compl. ¶¶ 196–208.)  Without a specific reference to what liberty or

---

[21] Although not the focus of *Sylvia*, the Fourteenth Amendment Due Process Clause also protects against state deprivation of or excessive interference with "liberty interests."  *Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 170 (4th Cir. 2010) (internal citations omitted).

property interest the Individual Defendants deprived Monegain of and which of the Individual Defendants did so, Monegain has not stated a claim to relief.

Furthermore, Monegain does not address the Individual Defendants contention that they "could not have deprived Monegain of her procedural due process rights, as she was a Commonwealth [of Virginia] employee entitled to utilize the State Grievance Procedure if she had been disciplined or terminated."[22]  (Mem. Supp. Mot. Dismiss 13.)  "To state a successful claim for failure to provide due process, 'a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate.'" *Root v. Cnty. of Fairfax*, 371 F. App'x 432, 434 (4th Cir. 2010) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).  A plaintiff cannot state a claim for procedural due process where

---

[22] Virginia Code § 2.2-3004(A) sets forth the state grievance procedure for public employees in Virginia, stating in relevant part that:

> [a] grievance qualifying for a hearing shall involve a complaint or dispute by an employee relating to the following adverse employment actions in which the employee is personally involved, including (i) formal disciplinary actions, including suspensions, demotions, transfers and assignments, and dismissals resulting from formal discipline or unsatisfactory job performance; (ii) the application of all written personnel policies, procedures, rules and regulations where it can be shown that policy was misapplied or unfairly applied; (iii) discrimination on the basis of race, color, religion, political affiliation, age, disability, national origin, sex, pregnancy, childbirth or related medical conditions, marital status, sexual orientation, gender identity, or status as a veteran; (iv) arbitrary or capricious performance evaluations; (v) acts of retaliation as the result of the use of or participation in the grievance procedure or because the employee has complied with any law of the United States or of the Commonwealth, has reported any violation of such law to a governmental authority, has sought any change in law before the Congress of the United States or the General Assembly, or has reported an incidence of fraud, abuse, or gross mismanagement; and (vi) retaliation for exercising any right otherwise protected by law.

VA. CODE ANN. § 2.2-3004(A); *see also* VA. CODE ANN. §§ 2.2-3004(E), 2.2-3005, and 2.2-3006 (setting forth procedural provisions of grievance procedures as amended in June 2020 after the Parties filed briefing in this matter).

39

"the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Suzuki*, 227 F.3d at 116 (citing *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)).  The record is bereft of any indication that Monegain attempted to avail herself of the Virginia State Grievance Procedure, or any allegation that such remedies were insufficient to cure the Individual Defendants alleged deprivation of Monegain's liberty or property interest.

Without any reference to what liberty or property interest the Individual Defendants acted to deprive Monegain of, nor how the Virginia State Grievance Procedure was inadequate to remedy this deprivation, the Court cannot weigh a Fourteenth Amendment procedural due process claim.  Monegain has thus not asserted facts giving rise to a procedural due process claim.

### 2.    Monegain Does Not Plead a Substantive Due Process Claim

A substantive due process claim, if alleged, falters on similar grounds.  To state a substantive due process claim, Monegain must demonstrate:  "(1) that [she] had property or a property interest; (2) that [Defendants] deprived [her] of this property or property interest; and (3) that [Defendants'] action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Sylvia*, 48 F.3d at 827 (internal citations omitted).  "Substantive due process is a far narrower concept than procedural; it is an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement them." *S.C. Dep't of Soc. Servs.*, 597 F.3d at 170 (internal citations omitted).

Again, Monegain has not identified in her Complaint, with specificity:  (1) a specific liberty or property interest; (2) how each individual defendant deprived her of this liberty or property interest; nor (3) how each of the Individual Defendants' hypothetical actions fell outside

40

the bounds of legitimate government action so that no process could cure the deficiency. Furthermore, because Monegain would still need to show how "no process could cure the deficiency," *Sylvia*, 48 F.3d at 827 (internal citations omitted), she would still need to state facts showing that the Virginia State Grievance Procedure was inadequate to remedy the Individual Defendants' deprivation of her liberty or property interest.  *Root*, 371 F. App'x at 434. Monegain has thus not asserted facts plausibly giving rise to a substantive due process claim.

Given these bare allegations, Monegain does not state a claim under the Fourteenth Amendment Due Process Clause.  For three reasons, the Court concludes Monegain does not state a Fourteenth Amendment Due Process Claim:  (1) she does not state what liberty or property interest she was "deprived" of by the Individual Defendants; (2) she does not identify which of the Individual Defendants deprived her of that liberty or property interest; and, (3) she omits any reference to the State Grievance Procedure.  *Sylvia*, 48 F.3d at 827 (internal citations omitted).  The Court will dismiss Monegain's Due Process Claim in Count V without prejudice.

### IV.  Qualified Immunity

The Court will deny as moot the Individual Defendants' Motion to Dismiss on Qualified Immunity grounds and allow them to refile within sixty (60) days in light of case law that has developed since Monegain initiated this action.

The Court has determined that Monegain articulates a claim against two of the Individual Defendants for violations of her constitutional rights.  Monegain plausibly alleges claims against Hussey and Baxter for First Amendment retaliation, and one against Baxter under the Equal Protection Clause for differential treatment based on her status as a transgender woman.  In response, the Individual Defendants argue that even if Baxter and Hussey violated Monegain's constitutional rights, they "are entitled to qualified immunity because . . . the constitutional right

41

Monegain complains of was not clearly established at the time it was allegedly violated." (Reply Mot. Dismiss 3.)

The Parties filed the Motion to Dismiss and briefing prior to the Supreme Court's decision in *Bostock* and the Fourth Circuit's decision in *Grimm*. Upon due consideration and in the interest of fairness, the Court concludes that the Parties should have the opportunity to incorporate both decisions into their briefing on the qualified immunity issue. The Court will deny as moot the Individual Defendants Motion to Dismiss as to arguments on qualified immunity and allow Baxter and Hussey to refile a Motion to Dismiss within sixty (60) days of the date of this Memorandum Opinion and Order. Any renewed Motion to Dismiss should focus solely on Baxter and Hussey's qualified immunity to the surviving claims in Count IV and Count V of Monegain's Complaint. Monegain will respond to any renewed Motion to Dismiss within twenty-one (21) days of refiling, and Baxter and Hussey will reply within fourteen (14) days of Monegain's response.

The Court will stay discovery in this matter until the Court rules on Baxter and Hussey's renewed Motion to Dismiss on the qualified immunity issue, or until Baxter and Hussey submit a notice of their intent not to refile a Motion to Dismiss.

## V.  Conclusion

For the foregoing reasons, the Court grants in part and denies in part the Individual Defendants Motion to Dismiss. (ECF No. 19.)

An appropriate Order shall issue.

_____
/s/
M. Hannah Lauck
United States District Judge

Date: 9|30|2020
Richmond, Virginia